UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AMERICAN CASUALTY COMPANY OF
READING PENNSYLVANIA,

        Plaintiff,

                      Case No.: 8:07-cv-421-T-33EAJ

v.

HEALTH CARE INDEMNITY, INC.,

        Defendant.

_____/

**ORDER**

    This matter comes before the Court upon consideration of
Defendant HCI's motion for summary judgment (Doc. # 103) and
Plaintiff ACC's motion for summary judgment (Doc. # 105), both
filed on November 17, 2008. The cross motions for summary
judgment are ripe for this Court's review. (Doc. ## 116, 118).
Also before this Court is ACC's motion to strike, in whole or
in part, the affidavit of Philip J. Spengler, II, Esq. filed
in support of HCI's motion for summary judgment (Doc. # 117),
which was filed on December 5, 2008. HCI filed a response in
opposition to the motion to strike on December 16, 2008. (Doc.
# 122).

    Upon due consideration and for the reasons that follow,
this Court grants HCI's motion for summary judgment. This
Court denies ACC's motion for summary judgment and denies
ACC's motion to strike.

## I.  Background

ACC and HCI are both insurance companies that provided insurance coverage to Dorothy Butler, a speech pathologist who is not a party to the present suit.

ACC's policy of insurance covered Butler's actions regardless of where she performed such services.  HCI, on the other hand, provided insurance to Edward White Hospital and hospital employees (including Butler) to the extent that the employees were performing services at the Hospital.

The purpose of this suit is to determine the liability as between ACC and HCI with respect to a sizeable jury verdict returned against Butler after a wrongful death/tort trial in state court as well as the $373,783.77 total defense costs incurred by ACC in defending Butler in the litigation.  (Doc. # 133 at 6).[1]  On April 21, 2009, the parties filed their pretrial statement, which contains undisputed facts. (Id. at 8-12).  This Court adopts the parties' statement of the

_____

[1] Over the course of this litigation, the parties have provided varying amounts for the total litigation expense that ACC expended in defending Butler.  For instance, in ACC's complaint against HCI, ACC reported that it expended $429,255.72 in its defense of Butler. (Doc. # 1 at ¶ 41). Likewise, in its trial brief, HCI indicates that the legal fees amounted to $429,255.72. (Doc. # 129 at 1).  This Court utilized $373,783.77 as the total litigation expense for Butler because this is the amount that the parties agreed upon in the pretrial statement. (Doc. # 133 at 6).

undisputed facts and expounds upon the facts from its independent review of the record.

## A.    <u>The Underlying Litigation</u>

In the underlying state court case, the plaintiff was the Estate of Linda O'Dell. (Doc. # 1-5). Linda O'Dell died under the care of Butler as well as other doctors and nurses. (<u>Id.</u>) The operative complaint governing the O'Dell litigation was the Fifth Amended Complaint. (<u>Id.</u>) The named defendants in the O'Dell litigation included Butler, Dr. Pagan, Edward White Hospital, Greenbrook Nursing Home, Palm Rehab Services, L.L.C., Grand Management Group, L.L.C., and others. (<u>Id.</u>)

In general, the Fifth Amended Complaint alleged that Butler instructed Dr. Pagan to install a valve on O'Dell's tracheotomy tube to allow O'Dell to swallow food, among other things. (<u>Id.</u>) Complications arose, and O'Dell died. (<u>Id.</u>) This Court draws from the following factual allegations as stated in the Fifth Amended Complaint, filed in the O'Dell litigation, to describe the nature of O'Dell's condition and Butler's role in her demise:

> Defendant Dorothy Butler was a speech pathologist who was working as an agent, employee, servant, and/or contractor or consultant at multiple hospitals and nursing home facilities throughout Pinellas County, Florida. . . . On April 26, 2001, Linda O'Dell was admitted to Bayfront Medical Center after suffering bodily injuries when she was

struck by a drunk driver in a motor vehicle collision. Ms. O'Dell remained hospitalized for approximately one month, at which time her condition stabilized and her treating physicians recommended placement in a nursing home facility for continued skilled care. On or about May 30, 2001, Linda O'Dell was discharged from the hospital and was accepted for placement at Greenbrook NH. When she was admitted to Greenbrook NH, Linda O'Dell was on antibiotics with a tube feed and had a tracheotomy in place, thus requiring continued respiratory and supportive care. Additionally, Ms. O'Dell was a bed-bound resident who was totally dependent upon the nursing home facility . . . for skilled nursing, tracheotomy, respiratory and supportive care. While a resident at Greenbrook NH, Linda O'Dell was under the care of . . . Defendant Butler and Defendant Pagan. On July 18, 2001, while working at Greenbrook NH, Defendant Butler recommended a video swallow study to be performed on Linda O'Dell to determine if she could tolerate oral dietary intake. On July 23, 2001, Ms. O'Dell was admitted to the Edward White Hospital where an evaluation was completed by Defendant Butler and a fluoroscopy study was subsequently performed. According to the "Edward White Hospital Department of Speech Language Pathology Videofluoroscopy Swallow Report" completed by [Defendant] Butler, Ms. O'Dell was positive for aspiration of thin liquid barium but not of thick liquid or puree. In her subsequent report Defendant Butler recommended that Linda O'Dell be placed on a regular diet, with thin liquids, and wear a Passy Muir valve for assistance while eating. Defendant Butler did not outline and/or provide any specific instruction or training as to the institution, placement or use of the Passy Muir device or make any recommendations that Ms. O'Dell be monitored for any specific timeframe to determine if she could tolerate the device without experiencing respiratory distress. Further, Defendant Butler did not outline and/or provide any specific instruction or training as to the tracheotomy cuff use, cuff deflation and the application of oxygen when instituting a Passy Muir

> valve. . . . Following placement of the Passy Muir
> valve and institution of said diet, Ms. O'Dell was
> left unattended in her room by the facility staff.
> Shortly thereafter, she experienced respiratory
> distress, suffocated and died on July 24, 2001, at
> the age of 46.

(Id. at ¶¶ 3-26).

Thus, the O'Dell Estate accused Butler of negligence in her professional capacity while performing services at both Greenbrook Nursing Home and Edward White Hospital.

Butler, through counsel, requested that HCI contribute to her defense and indemnification. (Doc. # 105-27). HCI admits that it ignored Butler's requests for insurance coverage. (Doc. # 105-21). Prior to the trial of the case, several of the defendants settled with the O'Dell Estate. Notably, in June 2005, the O'Dell Estate, Edward White Hospital, and HCI entered into a settlement agreement where HCI paid $75,000 to release Edward White Hospital. (Doc. # 62-2). Edward White Hospital was dismissed from the underlying suit with prejudice on July 29, 2005. (Doc. # 105-21). In the first paragraph of the release, it appears that both Edward White Hospital and Butler were released by the O'Dell Estate:

> In and for consideration of the payment to the
> Plaintiff, Vinita Register, as Personal
> Representative of the Estate of Linda O'Dell,
> Deceased, (Releasor) by and on behalf of the
> Defendant, Edward White Hospital, Inc. and Health
> Care Indemnity, Inc. (Releasees) of the sum of

Seventy-Five thousand Dollars and 00/100 ($75,000),
. . . the Releasor hereby . . . discharges the
Edward White Hospital and its insurer from
liability for the actions of their agents,
employees, and servants, including Defendant
Dorothy Butler, on July 23, 2001, while Linda
O'Dell was a patent [sic] at its hospital facility
undergoing a video swallow study from 1:31 p.m. to
2:51 p.m. only.

(Doc. # 62-2 at 1).

However, in the second paragraph of the release, the

O'Dell Estate specifically retains a cause of action against

Butler for her actions prior to and after her activities at

Edward White Hospital:

By executing this settlement, agreement, the
parties do not intend to release any other persons,
firms, corporations or any other named Defendant,
including Defendant Dorothy Butler or her personal
insurance carrier, from any and all causes of
action in any way relate[d] to the allegations set
forth in Plaintiff's complaint, and there has been
no consideration paid by the Releasees or . . . the
remaining Defendants, including Defendant Dorothy
Butler and/or her personal insurance carrier to the
Releasor to release any other persons, firms, or
corporations or the remaining Defendant for acts of
negligence occurring prior to or subsequent to her
hospitalization at Edward White Hospital on July
23, 2001 from 1:31 p.m. to 2:51 p.m.

(Doc. # 62-2).

On January 17, 2006, at the close of the O'Dell Estate's

case, and prior to closing arguments, counsel for Butler moved

for a directed verdict in favor of Butler on the basis that

the O'Dell Estate released Butler from liability. (Doc. # 56-

13 at 12). The trial court, Hon. Amy Williams, denied the motion, holding that the release only released Edward White Hospital. (Id.) Notwithstanding the trial court's ruling, HCI continues to advance the theory that the release covered Butler's negligence at Edward White Hospital. ACC, on the other hand, contends that the release applied only to Edward White Hospital and that the O'Dell Estate retained its right to sue Butler for her actions at Edward White Hospital and elsewhere. Accordingly, there is a dispute between the parties as to whether the release applied to Butler in her capacity as employee of Edward White Hospital.[2]

On January 24, 2006, the jury in the O'Dell litigation rendered its verdict in favor of the O'Dell Estate in the amount of $2,577,980. (Doc. # 1 at ¶ 35). However, immediately prior to the return of the jury's verdict, Butler and the O'Dell Estate entered into a "high-low agreement" and the agreement capped Butler's liability at $1,000,000. (Doc. # 1 at ¶ 31-35, Doc. # 103-7).

---

[2] Because this Court's adjudication of the cross motions for summary judgment is not impacted in any way by the release, the parties' differing interpretations of the release do not prevent the entry of summary judgment. In addition, because the motion to strike pertains solely to the release document, this Court denies the motion to strike as moot because it was not necessary to consider the document (an affidavit) regarding the release.

As to Butler's liability, the jury's verdict was a simple one. The jury answered "yes" in response to a single interrogatory: "Was there negligence on the part of Dorothy Butler which was a legal cause of the death of Linda O'Dell?" (Doc. # 103-8 at 1).

The jury was not sent to deliberate with special interrogatories aimed at identifying when and where Butler committed the negligent acts that led to O'Dell's demise. (Doc. # 103-8). The special interrogatories on the verdict form concerning Butler addressed damages only. (<u>Id.</u>).

### B. ACC's Complaint Against HCI

ACC paid the O'Dell Estate $1,000,000 on behalf of Butler, and ACC incurred $373,783.77 in fees and costs related to Butler's defense. (Doc. # 1 at ¶¶ 40-41; Doc. # 133 at 6). On March 8, 2007, ACC filed the present suit against HCI contending that HCI is liable for some or all of the $1,373,783.77. (Doc. # 1).[3] ACC's four-count complaint against HCI seeks declaratory relief and damages. (Doc. # 1). In count one, ACC asserts that its insurance policy provided Butler with excess coverage and that HCI was Butler's primary carrier. Accordingly, ACC seeks a declaration that "In regard

---

[3] The basis of this Court's jurisdiction is diversity of citizenship pursuant to 28 U.S.C. § 1332.

to the claims made against Ms. Butler in the O'Dell Estate's Fifth Amended Complaint, HCI's policy provides primary coverage; American Casualty's policy provides excess coverage; and HCI breached its duties to defend and indemnify Ms. Butler in the O'Dell Litigation." (Doc. # 1 at ¶¶ 49-57).

In count two, ACC seeks equitable/conventional subrogation from HCI in an amount equal to 100% of the amount paid by ACC in indemnity to the O'Dell Estate to settle the O'Dell Estate's liability claims against Butler, and 100% of the amounts paid by ACC to defend Butler in the O'Dell litigation. (Doc. # 1 at ¶¶ 58-73). In count three, ACC seeks an alternative declaratory judgment that HCI is Butler's co-primary insurer and is obligated to pay a ten-elevenths pro rata by policy limits share of the one million dollar indemnity payment made by ACC on Butler's behalf ($909,090.90). (Doc. # 1 at ¶¶ 74-82).[4] Count four asserts an alternative claim for equitable contribution from HCI based on ACC's theory that HCI breached its duty to defend and indemnify Butler . (Doc. # 1 at ¶¶ 83-96).[5]

---

[4] ACC asserts that HCI's share is ten-elevenths because ACC's per occurrence policy limit is one million dollars, and HCI's per occurrence policy limit is ten million dollars.

[5] ACC has attached to its complaint the ACC policy (Doc. # 1-2); the HCI Policy (Doc. # 1-3); and the Fifth Amended

### C.  **Summary Judgment Proceedings**

On April 17, 2008, prior to the close of discovery and with only one exhibit presented to the Court, HCI filed a motion for summary judgment. (Doc. # 47).  This Court denied HCI's initial motion for summary judgment without prejudice, essentially finding that the motion was filed prematurely. (Doc. # 96).

After the close of discovery and with a complete record presented to the Court, the parties filed cross motions for summary judgment on November 17, 2008. (Doc. ## 103, 105). HCI asserts, among other things, that it provided insurance coverage to Butler only in her capacity as an employee of Edward White Hospital and, because the jury entered a general verdict against Butler, it cannot be determined whether the jury found Butler liable for negligence as an employee of Edward White Hospital (that is, it is not possible to determine what portion, if any, of the verdict should be allocated to HCI).

In addition, HCI argues that it did not have a duty to defend Butler because ACC assumed the duty to defend Butler. Furthermore, HCI asserts that ACC was obligated to provide a

---

Complaint as filed in the O'Dell litigation (Doc. # 1-4).

defense to Butler as a primary insurer, and ACC has no right to reimbursement of defense fees from HCI. Finally, HCI asserts that a release shields HCI from ACC's demands.

ACC, on the other hand, argues that HCI was Butler's primary insurer, and that ACC was Butler's excess insurer. Under that theory, ACC asserts that HCI had a duty to defend Butler, and HCI failed to defend Butler. Under an alternative theory of the case, ACC asserts that ACC and HCI are co-primary insurers of Butler, and that HCI owes a pro rata policy limits share of the jury verdict and accrued attorneys' fees.

This Court will address these issues as necessary to rule on the cross motions for summary judgment.

## II.  **Legal Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-

12

moving party's favor.  <u>Shotz v. City of Plantation, Fla.</u>, 344 F.3d 1161, 1164 (11th Cir. 2003).  If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment.  <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988)(citing <u>Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau</u>, 835 F.2d 855, 856 (11th Cir. 1988)).  However, if non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required.  <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981), <u>cert.</u> <u>denied</u>, 456 U.S. 1010 (1982).

## III. <u>Analysis</u>

In this diversity case, the Court applies the substantive law of the forum state unless federal constitutional or statutory law compels a contrary result.  <u>Tech. Coating Apps., Inc. v. United States Fid. & Guar. Co.</u>, 157 F.3d 843, 844 (11th Cir. 1998).  Furthermore, this Court must apply Florida law in the same manner that the Florida Supreme Court would apply it.  <u>Brown v. Nicholas</u>, 8 F.3d 770, 773 (11th Cir. 1993).

In the present case, both parties agree that Florida insurance law governs the issues before the Court. (Doc. # 105-31). Under Florida law, the interpretation of an insurance contract is a matter of law to be decided by the court. Gas Kwick, Inc. v. United Pac. Inc. Co., 58 F.3d 1536, 1539 (11th Cir. 1995). Courts must construe an insurance contract in its entirety, striving to give every provision meaning and effect. Id. (citing Dahl-Eimers v. Mut. of Omaha Life Ins. Co., 986 F.2d 1379, 1382 (11th Cir. 1993)). Furthermore, the Eleventh Circuit recently noted that "insurance contracts are to be construed in a manner that is reasonable, practical, sensible, and just. . . . Terms used in a policy are given their plain and ordinary meaning and read in the light of the skill and experience of ordinary people. Provisions that exclude or limit liability of an insurer are construed more strictly than provisions that provide coverage." United States Fire Ins. Co. v. Freedom Village of Sun City Ctr., 279 F. App'x 879, 880-881 (11th Cir. 2008)(internal citations omitted). The Eleventh Circuit further explained that if provisions in an insurance contract are "reasonably susceptible of more than one meaning, they are ambiguous and construed in favor of the insured. That rule applies if a genuine inconsistency, uncertainty, or ambiguity

14

in meaning remains after a review of the plain language." <u>Id.</u> at 881.

With this in mind, this Court will evaluate the policies in order to make a coverage determination.

**A.   <u>The Policies</u>**

ACC issued an occurrence-based Healthcare Providers Professional Liability Insurance Policy to Butler. (Doc. # 1-2). The policy contained a one million dollar each occurrence liability limit with an aggregate liability limit of five million dollars. (<u>Id.</u> at 2). Under the ACC policy, Butler was covered as follows: "We will pay all amounts up to the limit of liability which you become legally obligated to pay as a result of injury or damage. In addition to the limit of liability, we will also pay claim expenses. The injury or damage must be caused by a medical incident arising out of the supplying of, or failure to supply, professional services by you, or by anyone for whose professional acts or omissions you are legally responsible." (<u>Id.</u> at 9).

In contrast, HCI's policy, which was also an occurrence-based health care professional liability insurance policy, covered "HCA-Health Care Company and subsidiary organizations existing now or hereafter created or acquired." (Doc. # 1-3 at 1). HCI's policy was subject to a ten million dollar each

occurrence limit of liability and an unlimited aggregate limit of liability. (Doc. # 1-3 at 2). HCI's policy covered Edward White Hospital. Additionally, HCI stipulates that its policy covered Butler, but only to the extent that Butler performed services at Edward White Hospital. (Doc. # 105-8 at 2; Dep. Halliburton Doc. # 111-2 at 48:14-16, 61:10-14).

Both policies contain "other insurance" clauses. HCI's policy contains two "other insurance" clauses. HCI's specific "other insurance" clause states as follows:

> Other Insurance. If other insurance not afforded by the Company is available to any insured covering an occurrence also covered hereunder, the insurance afforded hereunder shall be excess of and not contribute with such other insurance. Amounts collectible under a self-insured trust plan or any other self-insured program are other insurance for the purposes of this policy. This Article VI, Paragraph 7, does not apply to excess insurance written specifically to be in excess of this policy. Nothing contained herein shall be construed to make this policy subject to terms, conditions, and limitations of any other insurance.

Doc. # 1-3 at 16). Additionally, HCI's coverage section states:

> [I]n any state or county where there exists a state fund or where other primary insurance has been purchased for purpose of providing compensation for patient injury and for which application has been made and for which coverage is included in this policy, the limits of liability shall apply excess over any other valid and collectible insurance. However, in no event shall the combination of such other insurance and the insurance afforded

16

hereunder exceed the limit of liability as stated
under Item 4, Coverage C of the Declarations.

(Doc. # 1-3 at 9).

ACC's policy states as follows with respect to other insurance policies:

OTHER INSURANCE AND RISK TRANSFER ARRANGEMENTS

Any loss resulting from any claim insured under any
other insurance policy or risk transfer instrument,
including but not limited to, self-insured
retentions, deductibles or other alternative
arrangements, which applies to this loss, shall be
paid first by those instruments, policies or other
arrangements. This insurance will not serve as
primary insurance where there is other applicable
insurance. It is the intent of this policy to
apply only to loss which is more than the total
limit of all deductibles, limits of liability,
self-insured amounts or other valid and collectible
insurance or risk transfer arrangements, whether
primary, contributory, excess, contingent, or
otherwise. This insurance will not contribute with
any other applicable insurance. In no event will
we pay more than our limit of liability.

(Doc. # 1-2 at 4).

ACC advances a number of arguments concerning its status as Butler's insurer. Initially, ACC argues that its policy is a "super excess" policy and that HCI's policy is Butler's primary insurance policy. In the alternative, ACC submits that ACC and HCI are co-primary insurers of Butler. Under both of ACC's theories, ACC contends that HCI breached its duty to defend and indemnify Butler.

17

Where more than one policy provides coverage for a loss, as in the present case, the priority of the competing policies should be decided by reference to "other insurance" clauses in the policies.  <u>Sentry Ins. Co. v. Aetna Ins. Co.</u>, 450 So.2d 1233, 1236 (Fla. 2d DCA 1984).  There are three types of other insurance clauses: (1) pro rata or proportionate recovery clauses; (2) excess insurance clauses; and (3) escape or no liability clauses. <u>Id.</u>  In <u>Auto-Owners Ins. Co. v. Palm Beach County</u>, the Court further described the three categories of other insurance clauses.  157 So.2d 820, 822 (Fla. 1963).  The court described a pro rata other insurance clause as "a provision to the effect that in the event of other insurance, the loss shall be borne pro-rata dependent upon the monetary limits of coverage." <u>Id.</u>  The <u>Auto-Owners</u> case further noted that an excess other insurance clause is "a provision that the policy shall be excess over any other valid and collectible insurance applicable to the liability" and that an escape other insurance clause is "a provision that if there is other valid and collectible insurance, the policy shall not apply." <u>Id.</u>

As noted, ACC initially asserts that its policy is a super excess policy and, in the alternative, ACC argues that its policy is an excess policy and HCI's policy is a primary

insurance policy. This Court rejects ACC's argument that its policy contains a "super-excess" other insurance clause. The cases discussing "super excess" other insurance clauses, such as <u>Md. Cas. Co. v. Horace Mann Ins. Co.</u>, 551 F. Supp. 907 (W.D. Pa. 1982), are not applicable to this case. To this Court's knowledge, Florida law does not recognize a "super excess" other insurance clause. Furthermore, ACC's policy does not contain an "escape" or "no liability" other insurance clause.

After evaluating the policies in question, this Court determines that ACC provided primary insurance coverage to Butler to the extent that Butler performed medical services at Greenbrook Nursing Home. ACC's policy is broader than HCI's policy because ACC provided coverage to Butler regardless of whether her services were performed at Edward White Hospital, Greenbrook Nursing Home, or at some other location.

HCI's policy (which was issued to the Health Care Company) only covered Butler when she was acting as an employee of Edward White Hospital. Thus, as between ACC and HCI, it cannot be disputed that ACC's policy was the only policy – the primary policy - providing coverage for O'Dell's claims of negligence occurring at Greenbrook Nursing Home. To the extent that ACC asserts that its "other insurance" clause

is an excess insurance clause with respect to Butler's actions at Greenbrook Nursing Home, ACC's arguments fail.  There was no other insurance covering Butler's actions at Greenbrook Nursing Home, and ACC was Butler's primary insurance for those actions.

Moving on to Butler's negligence, if any, at Edward White Hospital, this Court determines that ACC and HCI's "other insurance" clauses – both purporting to be excess insurers – are mutually repugnant under Florida law and cancel each other out.  Thus, both HCI and ACC provided primary coverage for Butler at Edward White Hospital.  As explained in <u>Twin City Fire Ins. Co. v. Fireman's Fund Ins. Co.</u>, 386 F. Supp. 2d 1272 (S.D. Fla. 2005):

> Where there is no incompatibility among other insurance provisions, they are to be enforced by their terms.  Difficulties arise when two policies contain the same other insurance provisions.  For example, where two policies both have excess clauses, there is no direct way to determine which should be treated as excess simply by reference to the policies.  In such cases, each policy provides that it does not attach until the other has paid its limits.  If a court were to give literal effect to each of the excess clauses, each policy would be cancelled out and the final result would depend upon which policy was read first.  Courts have, therefore, developed what is known as the rule of mutual repugnancy.  Under that rule, where two policies cover the same occurrence and both contain other insurance clauses, the excess insurance provisions are mutually repugnant and must be disregarded.  Each insurer is then liable for a

prorata share of the settlement or judgment.

Id. at 1278 (internal citations and quotations omitted);
See also Allstate Ins. Co. v. Executive Car & Truck Leasing,
Inc., 494 So.2d 487, 489 (Fla. 1986)("The Allstate policy and
both Commercial policies contain an 'other insurance' clause
which states that its policy will be excess over other
collectible insurance.  The 'other insurance' clauses in the
respective policies cancel each other out . . ."); Travelers
Ins. Co. v. Lexington Ins. Co., 478 So. 2d 363, 365 (Fla. 5th
DCA 1985)("In Florida, where two insurance policies contain
excess insurance clauses the clauses are deemed mutually
repugnant and both insurers become primary . . .").

In the present case, both policies state that they will
not serve as primary insurance where there is other applicable
insurance.  This is a classic excess "other insurance" clause,
and the other insurance clauses in the ACC and HCI policies
cancel each other out.

Having determined that ACC provided primary insurance
coverage for Butler's alleged negligence at Greenbrook Nursing
Home, and having also determined that ACC and HCI both
provided primary insurance coverage for Butler at Edward White
Hospital, this Court must apportion, if possible, the one
million dollar indemnity payment made to the O'Dell Estate and

the associated fees and costs as between ACC and HCI.

**B.  <u>The Ramifications of the Jury's Verdict</u>**

As noted above, the jury's verdict against Butler did not mention Edward White Hospital or Greenbrook Nursing Home.  On this basis, HCI argues that ACC is barred from seeking reimbursement from HCI for the one million dollar payment made to the O'Dell Estate after entry of the jury's verdict.  Specifically, HCI contends, "Because O'Dell alleged that Butler was liable for acts committed prior to or subsequent to the decedent's hospitalization at Edward White Hospital while Butler was acting as an employee/agent of other entities (including Greenbrook Nursing Home), and not as an employee of Edward White Hospital, the jury might have determined liability and damages based on acts/claims which were not covered under HCI's policy and for which HCI is not liable." (Doc. # 103 at 4).

A plethora of cases support HCI's position.  Particularly relevant to this Court's determination is <u>Guarantee Ins. Co. v. Gulf Ins. Co.</u>, 628 F. Supp. 867, 870 (S.D. Fla. 1986), <u>aff'd</u>, 811 F.2d 610 (11th Cir. 1987).  In <u>Guarantee</u>, an attorney, Richard Marx, was insured for professional malpractice by two insurance companies.  628 F. Supp. at 868. Specifically, Gulf insured Marx from January 28, 1974, until

22

January 28, 1978, on an "occurrence" basis and insured Marx from January 28, 1978, until January 28, 1980 under a "claims made" policy. Id. In addition, Guarantee insured Marx under a "claims made" policy from January 28, 1982, until January 28, 1983. Id.

Former clients sued Marx for malpractice alleging that Marx negligently prepared a 1973 stock option agreement and negligently represented a client in a lawsuit that commenced in 1975, and was settled prior to trial. Id. The jury found that Marx was negligent and returned a verdict in the former clients' favor. Id. However, as in the present case, "the malpractice suit . . . was presented to the jury without specific interrogatories delineating the various acts of negligent conduct; rather a general verdict was submitted to the jury." Id. Guarantee appointed counsel for Marx and Gulf paid 50% of the attorneys' fees. Id. Gulf refused to pay any portion of the judgment or to indemnify Guarantee for its expenditures. Id.

It was not disputed that Gulf covered Marx from 1975 until 1978, and the complaint against Marx alleged negligence outside of this temporal proximity. Id. at 870. Specifically, the complaint against Marx alleged negligence from 1978 until 1980. Id. Similar to HCI's position in the present case, Gulf

asserted that it was responsible for some, but not all of Marx' negligence, but Gulf was not required to pay any portion of the judgment against Marx because the jury returned a general verdict against Marx.

Applying Florida law, the court in <u>Guarantee</u> determined:

> Where the judgment includes elements for which an insurer may be liable as well as elements beyond the coverage of the policy, the burden of apportioning the damages is on the party seeking to recover from the insurer. There is no question that the issue of Marx' negligence is *res judicata*. The jury, however, returned a general verdict and no evidence now exists as to what portions, if any, of the verdict were based upon acts for which Gulf is liable. *Guarantee*, as the party seeking indemnity, has the burden of apportioning the damages and this it has failed to do.

<u>Id.</u> (citing <u>Universal Underwriters Ins. Corp. v. Reynolds</u>, 129 So.2d 689, 691 (Fla. 2d DCA 1961)).

The <u>Guarantee</u> court further noted that "Guarantee had appointed an attorney and had undertaken the defense of Marx. Guarantee had every opportunity to request a special verdict and thereby avoid the unfortunate situation it is now in. Having failed to obtain a special verdict, Guarantee is precluded, pursuant to the Florida case law cited herein, from recovering any payments from Gulf." <u>Id.</u> at 871.

In the present case it is not disputed that HCI's policy only provided coverage for Butler's negligence as an employee

of Edward White Hospital.  Because the O'Dell Estate alleged that Butler was negligent both at Edward White Hospital and elsewhere, ACC cannot show what portions, if any, of the jury's verdict were based on acts for which HCI may be liable.

As in the Guarantee case, ACC appointed an attorney for Butler and defended her throughout the action.  ACC had every opportunity to prepare and submit to the jury a special verdict form containing interrogatories.  ACC cannot meet its burden of proof. See Aetna Ins. Co. v. WACO Scaffold & Shoring Co., 370 So.2d 1149, 1151 (Fla. 4th DCA 1978)(regardless of the duty to defend, "the burden of proving the allegations regarding coverage is upon [the party seeking contribution] and [that party] failed to prove that [the other insurance company's] policies covered the liability upon which the verdict and judgment were founded."); Keller Indus., Inc. v. Employers Mut. Liab. Ins. Co. of Wis., 429 So.2d 779, 780 (Fla. 3d DCA 1983)(the party claiming coverage has the burden "to apportion damages and show that the settlement or portions thereof, represents costs that fell within the coverage provisions of the policy" and "an unjustified failure to defend does not require the insurer to pay a settlement where no coverage exists."); Jones v. Holiday Inns, 407 So.2d 1032, 1034 (Fla. 1st DCA 1981)("the party seeking indemnification

had the burden of showing entitlement to indemnification and failed to request the use of a special verdict, the use of a general verdict should stand as a bar to indemnification."); Reynolds, 129 So.2d at 691 ("where a judgment includes elements for which an insurer is liable and also elements beyond the coverage of the policy, the burden of apportioning these damages is on the party seeking to recover from the insurer. . . . That it is impossible for the plaintiff to do so in the case at bar does not change the basic predicament in which [plaintiff] finds himself."); Spencer v. Assurance Co. of Am., 39 F.3d 1146, 1149 (11th Cir. 1994)("Florida law clearly states that liability of an insurer depends upon whether the insured's claim is within the coverage of the policy. This remains true even when the insurer has unjustifiably failed to defend its insured in the underlying action.")

Under Florida law and based upon the use of a general verdict at Butler's trial, ACC failed to meet its burden of proof for contribution from HCI with respect to the one million dollar indemnity payment that ACC made to the O'Dell Estate on behalf of Butler. As such, this Court grants summary judgment in favor of HCI as to the one million dollar indemnity payment that ACC made to the O'Dell Estate.

This Court will now determine whether HCI is liable for attorneys' fees and costs.

**C.  Attorneys' Fees Generated in the O'Dell Litigation**

ACC contends that HCI had a duty to defend Butler and that HCI breached that duty.  Under Florida law, the duty to defend is "distinct from and broader than the duty to indemnify."  Baron Oil v. Nationwide Mut. Fire Ins. Co., 470 So.2d 810, 813-814 (Fla. 1st DCA 1985).  Further, as stated in Baron Oil, "if the complaint alleges facts showing two or more grounds for liability, one being within the insurance coverage and the other not, the insurer is obligated to defend the entire suit." Id.  In addition, "if the allegations of the complaint leave any doubt regarding the duty to defend, the question must be resolved in favor of the insured requiring the insurer to defend." Id. at 814.  Hence, "if the complaint alleges facts which create potential coverage under the policy, the duty to defend is triggered." Trizec Properties v. Biltmore Constr. Co., 767 F.2d 810, 812 (11th Cir. 1985).  However, as clarified in Freedom Village, "that duty does not extend to an excess insurer when a primary insurer has a duty to defend." 279 F. App'x at 881.

The underlying complaint in the O'Dell litigation alleged that Butler committed lethal negligence at Edward White

Hospital in her capacity as an employee of Edward White Hospital. (Doc. # 1-5 at ¶¶ 3, 5, 6). Upon consideration of the HCI policy, it cannot reasonably be contested that HCI's duty to defend Butler was triggered by the operative complaint in the O'Dell litigation. It does not appear that HCI contends that Butler was not an employee of Edward White Hospital or that she was acting outside the scope of her employment. Rather, HCI asserts that it did not breach its duty to defend Butler because ACC assumed the burden of defending Butler.

This Court agrees with ACC's contention that HCI had a duty to defend Butler. However, it is well settled Florida law that there is no right to contribution between insurance companies as to legal fees and costs. As stated in <u>Argonaut Ins. v. Md. Cas. Co.</u>, 372 So.2d 960 (Fla. 3d DCA 1979), "The duty of each insurer to defend its insured is personal and cannot inure to the benefit of another insurer. Contribution is not allowed between insurers for expenses incurred in defense of a mutual insured." <u>Id.</u> at 963 (internal citations omitted).

The <u>Argonaught</u> case further explained that the duty to defend is contractual, and that if it is breached it is the insured who has the right to sue, not a co-insurer who has no

right to contribution. Id. at 964. ACC's policy stated: "We have the right and will defend any claim. We will (A) do this even if any of the charges of the claim are groundless, false, or fraudulent; and (B) investigate and settle any claim, as we feel appropriate." (Doc. # 1-2 at 11, 15).[6]

The cases cited by ACC in support of shifting the fees and costs to HCI do not support ACC's position. Rather, Cont'l Cas. Co. v. United Pac. Ins. Co., 637 So.2d 270 (Fla. 5th DCA 1994), "declines" an invitation from the parties to allow suits for contribution between insurance companies. The Continental court acknowledged:

> The Legislature has not seen fit to allow contribution for costs or attorney's fees between insurance companies. If contribution for costs were allowed between insurance companies, there would be multiple claims and law suits. The insurance companies would have no incentive to settle and protect the interest of the insured, since another law suit would be forthcoming to resolve the coverage dispute between the insurance companies. This is contrary to public policy, particularly since the insured has been afforded legal protection and has not had to personally pay any attorney's fees.

Id. at 272 (citing Argonaut, 372 So.2d at 964). Likewise, Fla. Ins. Guar. Assoc., Inc. v. Reliance Ins. Co., 864 So.2d

---

[6] HCI's policy similarly stated, "The Company shall have the right and duty to defend any suit against the insured seeking such damages even if any of the allegations of the suit are groundless, false, or fraudulent." (Doc. # 1-3 at 1).

1126 (Fla. 2d DCA 2003), provides: "The law is well established that when an insurer unjustifiably refuses to defend its insured, the insurer is liable to the insured for the reasonable attorney's fees and other expenses incurred in defending the action . . ." Id. at 1129. Thus, Butler, the insured, not ACC, has standing to allege that HCI breached its duty to defend Butler.

To the extent that ACC seeks contribution from HCI for attorneys' fees and costs associated with Butler's defense, its request is flatly denied. ACC has not supplied this Court with one binding case allowing contribution between HCI and ACC as to Butler's attorneys' fees and costs. The cases of Phoenix Ins. Co. v. Fla. Farm Bureau Mut. Ins. Co., 558 So.2d 1048 (Fla. 2d DCA 1990) and Galen Health Care, Inc. v. Am. Cas. of Reading Pa., 913 F. Supp. 1525, 1534 (M.D. Fla. 1996), cited by ACC, allows for equitable subrogation between a primary insurer and an excess insurer. The Galen Health Care case provides: "Florida law recognizes a cause of action for equitable subrogation between primary and excess insurers arising from the payment of a claim by the excess insurer." Id. at 1531. In the present case, this Court has determined that HCI and ACC both provided primary coverage. Therefore, the type of equitable subrogation discussed in Galen Health

<u>Care</u> is not applicable.

On its face, this Court's decision to deny contribution and subrogation may appear to reward HCI's behavior of ignoring its insured's requests for coverage. However, Florida law dictates this outcome, especially because it cannot be contested that ACC was contractually obligated to defend Butler during the O'Dell litigation. While Butler is the proper person to bring a suit against HCI for failure to defend, on the facts of the present case, this Court acknowledges that there is little incentive for her to do so.

This Court has painstakingly applied Florida law to come to this conclusion. However, this Court finds support for this outcome in <u>Continental</u>:

> Continental contends broadly that, without the creation of this rule [the right to contribution among insurers], insurers will seek with impunity to evade their responsibilities to defend their Florida insureds. No evidence was offered below, however, that Florida's current rule disallowing contribution has led to "shirking," "lagging behind" or "bad faith" on the part of insurers. Presumably, Continental, one of the most prominent liability insurers in Florida, would deny it has ever been induced to act in such a manner. Several factors discourage such misconduct, including exposure to greater loss if the other insurer is ineffective in its defense, and the risk of suits by its own insured on theories of breach of contract and statutory and common law "bad faith." It is important to keep in mind that insurers have not only the *duty* to defend but often contractually reserve the *right* to defend. Insurers know the

31

> ability to control the defense of a liability case
> is the most effective way to limit their loss and
> protect themselves from extra-contractual claims.

Cont'l, 637 So.2d at 273.

To the extent that ACC asks this Court for contribution and subrogation for fees and costs against HCI, ACC is requesting this Court to create new law. This Court refuses to do so.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendant HCI's motion for summary judgment (Doc. # 103) is **GRANTED.**

(2) Plaintiff ACC's motion for summary judgment (Doc. # 105) is **DENIED.**

(3) Plaintiff ACC's motion to strike, in whole or in part, the affidavit of Philip J. Spengler, II, Esq. filed in support of HCI's motion for summary judgment (Doc. # 117) is **DENIED AS MOOT.**

(4) The Clerk is directed to enter judgment in favor of Defendant HCI and close this case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 29th day of April 2009.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:

All Counsel of Record